IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EILEEN SABEL,<br><br>                   Plaintiff,<br><br>    v.<br><br>SAINT LAZARUS BAR, et al.,<br><br>                   Defendants. | CIVIL ACTION<br>NO. 17-2781 |

**OPINION**

**Slomsky, J.**                                                                                                                                                   **July 1, 2019**

**I.  INTRODUCTION**

This disability discrimination case arises from Plaintiff Eileen A. Sabel's ("Plaintiff" or "Ms. Sabel") unsuccessful attempt to gain entry to the Saint Lazarus Bar (the "Saint" or the "Bar") on April 5, 2017.  Plaintiff, who is a wheelchair user, attempted to eat at the Saint but was unable to enter the Bar because of a step at the front door.  Plaintiff left the Bar, unaware at the time that the Saint provided wheelchair access by way of a portable ramp.

On June 26, 2017, Plaintiff initiated this case pro se by filing a Complaint against Defendants Saint Lazarus Bar, JJG Enterprises Incorporated, Janay M. Green, and Brendan Olkus (collectively, "Defendants"), alleging violations of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq.  (Doc. No. 3.)  Plaintiff claims the Saint unlawfully discriminates against individuals with disabilities by not having a permanent ramp at the main entrance to provide wheelchair access.  (Id.)

On October 16, 2017, Defendants filed an Answer in which they denied liability under Title III of the ADA, claiming that the Saint's use of a modular ramp satisfies their obligations under the ADA.  (Doc. No. 8.)  Defendants also asserted in the Answer a counterclaim against Plaintiff

1

for violation Federal Rule of Civil Procedure 11, which covers a party's representations to the Court. (Id.) Defendants claim that Ms. Sabel is a "serial filer" who initiated this lawsuit in violation of Rule 11 because the claims are frivolous and meritless. (Id.)

After affording the parties months to obtain fact discovery, and after multiple attempts between the parties to mediate this dispute, the Court held a bench trial on January 30, 2019. At the trial, the Court heard testimony from Ms. Sabel, Ms. Sabel's disability advocate, Morgan Hugo, Defendant Brendan Olkus, and Defendants' structural engineering expert, Mr. Tony Andraos, M.S.[1] The Court now makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT[2]

### A. The Parties

Plaintiff is an adult individual who, because of her disabilities, is confined to a motorized wheelchair. Plaintiff's disability advocate, Morgan Hugo ("Ms. Hugo"), is an employee of Liberty Resources, Inc., a Center for Independent Living that was established after the passage of the Rehabilitation Act in 1973. (Doc. No. 30 at 21.) Plaintiff and Ms. Hugo began working together in 2009. (Id.)

Defendant Saint Lazarus Bar ("the Saint" or "the Bar") is a small corner bar located in Plaintiff's neighborhood at 102 West Girard Avenue in Philadelphia, Pennsylvania. (Id. at 6-7, 22.) Saint Lazarus Bar is a tradename used by S&B Restaurant Group, LLC, which has not been named as a party in this case. (Doc. No. 31 ¶¶ 3-4.) S&B Restaurant Group, LLC owns, operates, and maintains the Saint. (Id.)

---

[1] M.S. stands for a Master of Science.

[2] All findings of fact are made by a preponderance of the evidence.

Defendant Brendan Olkus ("Mr. Olkus") is a member of S&B Restaurant Group, LLC and considers himself the self-employed owner of the Saint. (Id. ¶ 4; Doc. No. 30 at 58-59.) Defendant Janay M. Green ("Ms. Green") is an employee of S&B Restaurant Group, LLC and the General Manager of the Saint. (Id. ¶ 4; Doc. No. 30 at 60.)

Defendant JJG Enterprises, Inc. ("JJG") owns the building that houses the Saint at 102 West Girard Avenue, Philadelphia, Pennsylvania. (Doc. No. 30 at 59.) S&B Restaurant Group, LLC leases the building from JJG to operate the Saint. (Id. at 60.)

### B. The Location of the Saint

Saint Lazarus Bar is a small bar that operates out of the building owned by JJG at the corner of West Girard Avenue and Front Street in Philadelphia. (Doc. No. 30 at 59-60.) The building is a concrete structure with a basement that was built sometime in the 1800s. (Id. at 61.) Mr. Olkus has operated the Saint out of this building for the last six years. (Id. at 60.)

The main entrance to the Saint is located on Girard Avenue. (Id. at 66.) At the main entrance, there is a large step. (Id.) Mr. Olkus testified that the reason for there being a step is because the height of the basement ceiling extends above street level, thus raising the first floor of the building above the sidewalk. (Id.) Outside the main entrance, the Saint shares the sidewalk with a Septa transit stop and a PECO power box. (Doc. No. 30 at 69; Tr. Ex. D-1.) A few feet further down from the main entrance, there is a pillar supporting the elevated Septa train. (Doc. No. 30 at 69.)

Aside from the main entrance, there are two side doors to the Saint located on Front Street, both of which also have steps. (Id. at 66.) One of the doors on Front Street has been sealed from the inside for many years and is no longer capable of being used as an entrance to the Bar. (Id. at 42; Tr. Ex. D-1.) The other door on Front Street is three feet away from a water department corrosion control box, four feet away from a water department sewage access cover, and seven

feet away from a pillar supporting the elevated train. (Doc. No. 30 at 66; Tr. Ex. D-1.) Because the two doors on Front Street are not used as entrances to the Bar, the only entrance to the Saint is the main entrance located on Girard Avenue.

### C. Plaintiff's Attempt to Enter the Saint

Plaintiff testified that on April 5, 2017, at about 2:00 p.m., she went to the Saint with her disability advocate, Ms. Hugo, to eat "pub food." (Doc. No. 30 at 5-7.) Ms. Hugo testified that Plaintiff had been wanting to go to the Saint for some time because it was close to her home and it appeared to have interesting artwork in the window. (Id.) When Plaintiff and Ms. Hugo arrived at the Saint, Plaintiff could not enter the Bar in her motorized wheelchair because of the step at the main entrance. Ms. Hugo then went inside the Saint and spoke with Defendant Janay Green, the Bar's General Manager. (Id. at 22-23.) Ms. Hugo handed Ms. Green a Liberty Resources, Inc. brochure and asked Ms. Green to make the Saint wheelchair-accessible and ADA-compliant. (Id. at 22-23.) Ms. Green walked outside of the Saint to speak with Plaintiff, at which point Plaintiff and Ms. Hugo both testified that Ms. Green became combative and threatened to call the police if they did not leave the Bar immediately. (Id. at 7-12, 23.)

### D. Wheelchair Accessibility at the Saint

Mr. Olkus testified that the Saint utilizes a steel modular ramp for wheelchair access at the main entrance. (Doc. No. 30 at 62.) Mr. Olkus purchased the modular ramp before the events giving rise to this lawsuit occurred. (Id.) All employees of the Saint are trained in how to use the modular ramp, which takes about a minute to assemble. (Id.) Mr. Olkus testified that several customers have successfully used the modular ramp to gain entry to the Saint, including a close friend of his who is confined to a wheelchair and visits the Bar about once a month. (Id. at 63.)

In addition to the modular ramp, Mr. Olkus testified that after being informed of this lawsuit, he installed a doorbell at the front entrance. (Id. at 62; Tr. Ex. D-2.) The doorbell is

clearly marked with a wheelchair accessibility sign, and is set up to ring into the Bar and the Bar's office to alert employees that a disabled individual is outside who needs access to the building by use of the modular ramp. (Id.; Tr. Ex. D-2.)

### E. The Feasibility Study Concerning a Permanent Ramp at the Saint

After Plaintiff alleged that the Saint should be required to install a permanent ramp to comply with the ADA, Defendants retained the engineering firm Alfa Engineering, Inc. ("Alfa") to evaluate whether a permanent ramp at the main entrance would be feasible (the "feasibility study"). (Tr. Ex. D-1.) Following Alfa's study of the Saint, it compiled a report summarizing its findings and concluded that:

> It is not possible to install a handicap ramp on the front door of the above property because the side walk [sic] is shared with a bus stop and a PECO power box. There is simply no room. . . . There is simply no room to build the ADA ramp. The only solution is the modular ramp we [sic] have been using to provide access to disabled people.

(Id.) With respect to the two doors on Front Street, the feasibility study further concluded that:

> There are two doors on the side of the building along Front street [sic] one has been sealed from the inside for years and is no longer a door. The other is 3 feet away from a water department corrosion control box in the pavement, 4 feet away from a water dept sewage access cover and 7 feet from the pillar of the elevated train . . . .

(Id.)

To further explain the results of the feasibility study, Defendants presented at the trial the testimony of Mr. Tony Andraos, M.S., an expert in structural engineering and an employee of Alfa who assisted in the evaluation of the Saint. (Doc. No. 30 at 30, 33.) Mr. Andraos testified that under the ADA, all business ramps must adhere to a "one versus twelve rule," meaning that for every inch of height, there must be twelve horizontal inches of ramp. (Id. at 34.) Mr. Andraos

explained that the door of the Saint is about thirteen to fourteen inches higher than the sidewalk,[3] which, under the 1:12 requirement, would necessitate a permanent ramp that is approximately fourteen feet long. (Id. at 34-35.) Mr. Andraos testified that such a ramp would not be feasible at the front entrance of the Saint because it would run beyond the curb line and into the street. (Id.) Moreover, such a ramp would interfere with the nearby Septa transit stop, and an electrical pole that stands seven feet from the building. (Id. at 35.)

In addition, Mr. Andraos testified that making the main entrance level with the sidewalk is not a viable option. (Id. at 44-45.) Because of the building's basement, Mr. Andraos explained that there is no way to eliminate the gap between the first floor of the Bar and the street without tearing down and rebuilding the entire structure. (Id.) Mr. Andraos reaffirmed the conclusion in the feasibility study that the only way to make the Saint wheelchair-accessible was by continuing use of the modular ramp. (Id. at 50.)

## III. CONCLUSIONS OF LAW

### A. Background on Title III of the ADA

Congress enacted the ADA in 1990 with the purpose of providing "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b). "To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, among them

---

[3] Mr. Andraos testified that the door of the Saint is about thirteen to fourteen inches above the sidewalk. Mr. Olkus testified, however, that the first floor of the Saint is about ten inches above the sidewalk. (Doc. No. 30 at 66.) The Court will use Mr. Andraos's measurement of fourteen inches because it is the measurement on which the feasibility study was based. Even so, the Court finds that the structural barriers that prevent an ADA-compliant permanent ramp at the Saint exist regardless of whether the front step is ten or fourteen inches from street level.

employment (Title I of the Act), public services (Title II), and public accommodations (Title III)." PGA Tour, Inc. v. Martin, 532 U.S. 661, 675 (2001).

Title III of the ADA generally prohibits discrimination in public accommodations. More specifically, Title III provides:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). Title III affords a private right of action "to any person who is being subjected [by a place of public accommodation] to discrimination on the basis of disability . . . ." 42 U.S.C. § 12188(a)(1).[4] To recover on a claim for discrimination under Title III, a plaintiff must prove (1) that she is disabled within the meaning of the ADA; (2) that defendants are a place of public accommodation or that they own, lease, or operate a place of public accommodation; and (3) that she was discriminated against on the basis of her disability by defendants denying her the full and equal enjoyment of public accommodations. See Doris v. Dougherty, 192 F. Supp. 2d 358, 368 (E.D. Pa. 2002).

The parties do not contest that Plaintiff, as a wheelchair-bound individual, is disabled within the meaning of the ADA. Nor do the parties dispute that the Saint qualifies as a "place of public accommodation" as defined by the Statute. See 42 U.S.C. § 12181(7)(B) (defining "public accommodation" to include "a restaurant, bar, or other establishment serving food or drink"). The issue in this case is whether Plaintiff has satisfied the third element by proving that Defendants discriminated against her by refusing to install a permanent ramp at the Saint.

---

[4] Private plaintiffs are entitled to seek prospective injunctive relief against the public accommodation, but they are not entitled to monetary damages. 42 U.S.C. § 12188(a).

### B. Discrimination under Title III of the ADA

The term "discrimination" is not defined in Title III. Meknowitz v. Pottstown Mem'l Med. Ctr., 154 F.3d 113, 116 (3d Cir. 1998). Rather, Title III "provides several general prohibitions, which bar broad categories of conduct that constitute discrimination . . . ." McGann v. Cinemark USA, Inc., 873 F.3d 218, 222 (3d Cir. 2017) (internal quotation omitted). These general prohibitions include the rule stated above that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

Title III also includes specific prohibitions on conduct that qualifies as discrimination. Relevant here, Title III specifically prohibits a public accommodation's "failure to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable."[5] 42 U.S.C. § 12182(b)(2)(A)(iv). The term "architectural barrier," though not defined in the ADA, means "physical features that limit or prevent people with disabilities from obtaining the goods or services that are offered," and "can include . . . a step or steps at the entrance or to part of the selling space of a store . . . ." Mielo v. Steak 'n Shake Operations, Inc., 897 F.3d 467, 477 (3d Cir. 2018) (citing the Department of Justice's ADA Guide for Small Businesses, available at https://www.ada.gov/smbusgd.pdf.).

---

[5] The ADA's accessibility requirements differ depending on when a facility was built or altered. Buildings constructed or altered after 1993 must be made "readily accessible to and usable" by individuals with disabilities. 42 U.S.C. 12183(a)(3); 28 C.F.R. § 36.406(a). Buildings constructed before 1993 are considered "existing facilities" and are subject to the less-stringent ADA requirement that architectural barriers be removed when it is "readily achievable" to do so. Here, the Court is concerned with the ADA's accessibility requirements as they pertain to "existing facilities" because the building that houses the Saint was built in the 1800s, and there is no evidence that the structure has been altered since 1993.

8

Regulations under the ADA instruct that public accommodations must overcome architectural barriers by making facilities "readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs." 28 C.F.R. § 36.402(a)(1). With respect to existing facilities, the regulations list examples of ways in which public accommodations can overcome architectural barriers. 28 C.F.R. § 36.304(b)(1). Important to this case, the regulations state that a public accommodation can remove an architectural barrier at an existing facility by installing a ramp. 28 C.F.R. § 36.304(b)(1).

The 2010 ADA Accessibility Guidelines ("ADAAG") set forth technical requirements governing the installation of permanent ramps at existing facilities.[6] 2010 ADAAG § 405. Pursuant to § 405.2 of the 2010 ADAAG, permanent ramps must be constructed so that they have a "running slope not steeper than 1:12," meaning that for every inch the ramp is high, it must be twelve inches flat.[7] Id. at § 405.2.

Importantly, the ADA requires that public accommodations install a permanent ramp only if installation is "readily achievable." The term "readily achievable" means "easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. §

---

[6] The United States Access Board develops and updates the ADAAG, which are guidelines "used by the Department of Justice (DOJ) and the Department of Transportation (DOT) in setting enforceable standards that the public must follow." About the ADA Standards, United States Access Board, https://www.access-board.gov/guidelines-and-standards/buildings-and-sites/about-the-ada-standards (last visited June 11, 2019). In 2010, the DOJ adopted the 2010 ADAAG. These guidelines are commonly referred to as the "2010 Design Standards." See 28 C.F.R. pt. 36, app. D; 28 C.F.R. pt. 1191, app. B, D.

[7] The 2010 Design Standards carve out exceptions to the 1:12 slope requirement for ramps at existing buildings where a steeper slope is necessary due to space limitations. 2010 ADAAG § 405. However, the exceptions only apply to ramps that do not exceed a maximum rise of six inches. In this case, the exceptions to the slope requirement do not apply because the step at the entrance of the Saint exceeds six inches.

12181(9); 28 C.F.R. § 36.304(a)(1).  In determining whether an action is readily achievable, the ADA sets forth the following factors to consider:

>  (A) the nature and cost of the action needed under this chapter;
>
>  (B) the overall financial resources of the facility or facilities involved in the action; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such action upon the operation of the facility;
>
>  (C) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and
>
>  (D) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C. § 12181(9).

### C. Defendants are not Liable Under the ADA Because Installing a Permanent Ramp at the Saint is not Readily Achievable

In this case, the architectural barrier that prevents Ms. Sable from being able to enter the Saint in her wheelchair is a step at the Saint's main entrance on Girard Avenue.  As Mr. Olkus explained during his testimony, the step at the main entrance is unavoidable because the basement underlying the Saint raises the floor of the Bar above the sidewalk.  (Doc. No. 30 at 66.)  Thus, the step accounts for the gap between the floor of the Saint and the street.  To replace the step at the Saint with a permanent ramp, the permanent ramp would also need to account for the gap between the floor and the street and, thus, the ramp would require an approximate fourteen-inch rise.  Under the ADAAG 1:12 slope ratio requirement, the ramp would then require fourteen feet in length. 2010 ADAAG § 405.2.

A fourteen-foot long ramp at the Saint is not "readily achievable" because there is not enough space to accommodate fourteen feet at the main entrance on Girard Avenue, or at the

unused entrance on Front Street. At the main entrance, Defendants' evidence establishes that a fourteen-foot long ramp would run past the curb and into the street, and it would interfere with a Septa transit stop and a PECO power box. (Doc. No. 30 at 35; Tr. Ex. D-1.) At the unsealed door on Front Street, aside from the fact that this door is not used as an entrance to the Bar, Defendants' evidence proves that a fourteen-foot long ramp would interfere with a water department control box three feet away, a water department sewage access cover four feet away, and a pillar supporting the elevated train that stands seven feet from the building. (Doc. No. 30 at 35; Tr. Ex. D-1.) Based on all the evidence, the Court finds that an ADA-compliant permanent ramp at the Saint is not readily achievable.

Where installation of a permanent ramp is not readily achievable, the ADA regulations allow public accommodations to use portable ramps to provide access to the disabled:

> Portable ramps should be used to comply with this section only when installation of a permanent ramp is not readily achievable. In order to avoid any significant risk to the health or safety of individuals with disabilities or others in using portable ramps, due consideration shall be given to safety features such as nonslip surfaces, railings, anchoring, and strength of materials.

28 C.F.R. § 36.304(e). In line with this regulation, the Saint utilizes a steel portable ramp to provide access to wheelchair users, and Defendants train employees in the proper use and assembly of the ramp in an effort to minimize safety risks. (Doc. No. 30 at 62.) Additionally, Plaintiff's initiation of this case has sparked Defendants to install a doorbell at the main entrance of the Saint so that disabled customers can easily alert employees inside the building that they need someone to come outside and assemble the modular ramp.

Based on these measures Defendants have taken to ensure that the Saint is wheelchair-accessible despite the unavoidable barrier that is the step at the main entrance, and given that a

permanent ramp is not readily achievable, the Court finds that Defendants do not discriminate against individuals with disabilities in violation of Title III of the ADA.

**D. Defendants' Counterclaim has been Abandoned**

As noted above, Defendants have asserted a counterclaim against Ms. Sabel for violation of Federal Rule of Civil Procedure 11. (Doc. No. 8.) Federal Rule of Civil Procedure 11 states, in relevant part, that:

> By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> 1. it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> 2. the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> 3. the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> 4. the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b). In the counterclaim, Defendants allege that Ms. Sabel has violated Rule 11(b) by initiating this case because the claims she asserts are frivolous and without merit. (Doc. No. 8.)

At trial, however, Defendants did not pursue the counterclaim. At no point during the trial did Defendants discuss the counterclaim or introduce evidence to support their allegations. Moreover, Defendants did not raise the counterclaim in their post-trial submission to the Court. (Doc. No. 31.) Given Defendants' failure to litigate the counterclaim, the Court infers that the counterclaim has been abandoned, and will dismiss the claim with prejudice. See Datasphere, Inc.

v. Computer Horizons Corp., No. 05-2717, 2009 WL 2132431, at *10 (D.N.J. July 13, 2009) (dismissing with prejudice the defendant's counterclaim for breach of contract after finding that defendant had abandoned the claim by not mentioning it in post-trial briefing); Nixon v. Runyon, 856 F. Supp. 977, 983 n.3 (E.D. Pa. 1994) (deeming a claim "abandoned" where the plaintiff failed to produce evidence or argument on the claim at trial).

Despite this abandonment, it is evident that Rule 11 sanctions would not be warranted in this case. Ms. Sabel is proceeding pro se, and based on the evidence could have a good faith belief that she was the subject of discrimination. Although the Court has found otherwise, it does not mean that Ms. Sabel violated Rule 11.

## IV.    CONCLUSION

For the foregoing reasons, judgment will be entered in favor of Defendants on Plaintiff's claim for disability discrimination under Title III of the ADA. Defendants' counterclaim for violation of Federal Rule of Civil Procedure 11 will be dismissed with prejudice. An appropriate Order follows.